## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| TOSOH CORPORATION, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | NO. 2:24-CV-00138-JRG |
| | § | |
| DENTAL DIREKT GMBH, | § | |
| | § | |
| *Defendant.* | § | |

### MEMORANDUM CLAIM CONSTRUCTION OPINION AND ORDER

In this patent case, Tosoh Corporation alleges infringement by Dental Direkt Gmbh (Direkt) of claims from four patents related to a composition for use in dental applications, like crowns and bridges. *See* U.S. Patent 9,249,056 at 1:6–8 (noting the invention "relates to a zirconia sintered body having not only high strength but also aesthetic properties quite similar to those of natural teeth"); U.S. Patent 9,309,157 at 1:22–25 ("[T]he invention relates to a zirconia sintered body for use in dental applications, which is suitable for use as a mill blank for a denture material or the like or as an orthodontic bracket."); U.S. Patent 9,737,383 at 1:9–13 (noting the invention is a "highly translucent zirconia sintered body . . . useful for dental applications, in particular for a front tooth"); U.S. Patent 11,548,825 at 1:7–8 ("The present disclosure relates to a composition in which layers of zirconia are layered and to a zirconia layered body.").

The parties have three disputes from the four patents. Three of the patents have claims that recite a "relative density," which Direkt challenges as an indefinite term under the three-part test summarized in *Ball Metal Bev. Container Corp. v. Crown Packaging Tech., Inc.*, 838 Fed. App'x 538 (Fed. Cir. 2020). Direkt makes a similar challenge to a different term from the '056 Patent,

"lightness L*." Finally, the parties dispute the proper construction of "calcined body," although they indicated some agreement on that term at the hearing.

## I.    BACKGROUND

### A.    U.S. Patent 9,249,056

The '056 Patent "relates to a zirconia sintered body having not only high strength but also aesthetic properties quite similar to those of natural teeth." '056 Patent at 1:6–8. Zirconia was known at the time of invention for use in dental applications. The patent explains that, in the prior art, conventional zirconia bodies were laminated to make the color closer to that of natural teeth, but the strength of the laminating material was not sufficient for dental applications. *Id.* at 1:18–25.

The patent describes the technical problem as arriving at "a zirconia sintered body having aesthetic properties equivalent to those of natural teeth, particularly a color tone and translucency equivalent to those of natural teeth, and having high strength." '056 Patent at 1:64–67. The prior art at the time had the right translucency, but were too bright and different in color tone. *Id.* at 1:30–38. Some of the prior art addressed that problem by adding a coloring agent, which negatively affected translucency by inhibiting the sintering process. *Id.* at 1:40–46.

The patent explains the inventors, after "conduct[ing] extensive studies on the relation between the color tone and the aesthetic properties of a zirconia sintered body," discovered the "compositions, physical properties and types of a coloring agent" that yields "aesthetic properties and strength suitable for dental materials." '056 Patent at 2:8–14. To that end, Claim 1 recites:

> 1.    A colored translucent zirconia sintered body, comprising
>
> at least one iron compound selected from the group consisting of iron chloride, iron nitrate, iron oxide and iron oxide hydroxide,

> yttria in the amount of from 2 to 4 mol %, and
>
> alumina in the amount of 0 wt % to less than 0.25 wt %,
>
> wherein the colored translucent zirconia sintered body has a **lightness L\*** of from 51 to 80 in L*a*b* color system, and has a **relative density** of at least 99.80%.

*Id.* at 19:34–42 (emphasis added). The parties dispute whether the claim is indefinite based on the use of the terms "relative density" and "lightness L*." Specifically, Direkt challenges the terms as indefinite based on the three-part test in *Ball Metal*, 838 Fed. App'x 538.

### B.    U.S. Patent 9,309,157

The '157 Patent relates to similar problems and solutions. The patent explains "[z]irconia sintered bodies containing a small amount of $Y_2O_3$ [yttria] in a solid solution state as a stabilizer have high strength and high toughness and are hence extensively [used] as . . . materials for the living body, such as dental materials." '157 Patent at 1:30–35. Zirconia sintered bodies, however, are ordinarily polycrystalline objects, which "do not give a sense of translucency . . . due to the light scattering caused by voids present between the crystal grains and within the grains." *Id.* at 1:45–48.

The patent describes two prior-art attempts to address the problem. One of those attempts has strength issues due to the large amount of titanium dioxide ($TiO_2$) used to make the body translucent. '157 Patent at 1:54–58. The other requires using hot isostatic pressure, because "sufficient translucency has not been obtained in sintered bodies [using] normal-pressure sintering." *Id.* at 1:59–67. In light of these prior-art attempts, the patent describes a need for (1) a zirconia sintered body that "has a high sintered-body density and high strength and has excellent translucency," and (2) "a simple process capable of producing such a zirconia sintered body through normal-pressure sintering." *Id.* at 2:14–18.

The patent explains the inventors made "detailed investigations on relationships between the state of alumina in a zirconia powder and each of sintered-body density and the total light transmittance of the sintered body." '157 Patent at 2:22–25. Those investigations led to findings that "for obtaining a translucent zirconia sintered body through normal-pressure sintering," one must "not only enhance the sinterability of a zirconia powder but also control the rate of sintering of the zirconia in a specific temperature range." *Id.* at 2:25–29. "[B]y controlling the rate of sintering on the basis of the properties of the alumina to be used as an additive," normal-pressure sintering yields translucent zirconia. *Id.* at 2:30–33. And for yttria-containing zirconia without alumina, controlling the sintering rate yields translucent zirconia. *Id.* at 2:33–36.

Claim 1 recites:

> 1. A translucent zirconia sintered body characterized by comprising zirconia which contains 2-4 mol % yttria as a stabilizer and has an alumina content of lower than 0.1 wt %, and by having a **relative density** of 99.8% or higher and a total light transmittance, as measured at a thickness of 1.0 mm, of 35% or higher;
>
> wherein relative density means the value obtained by measuring an actual density $\rho$ by the Archimedes method, determining a theoretical density $\rho o$ using the following equation (2), and converting these density values to the proportion $(\rho/\rho o)$ times 100(%), and in equation (2), the theoretical density of alumina and the theoretical density of zirconia containing 3 mol % yttria were taken as 3.987 (g/cm3) and 6.0956 (g/cm3), respectively,
>
> $$\rho o = 100/[(X/3.987)+(100-X)/6.0956] \qquad (2)$$
>
> {X is alumina content (% by weight)}.

'157 Patent at 19:56–2:37 (disputed term in bold). Here, too, the parties dispute whether the claim is indefinite based on "relative density," which Direkt says renders this claim indefinite under *Ball Metal*.

### C.    U.S. Patent 9,737,383

The '383 Patent involves similar concepts and describes similar problems. For example, the patent describes certain sintered bodies with insufficient translucency for dentures. *See* '383 Patent at 1:44–55. Other bodies require hot isostatic pressing, as sufficient translucency with pressureless sintering is not obtainable. *Id.* at 1:56–62. In other cases, "the transparency was too high and unnatural." *Id.* at 2:4–11.

Much like the '157 Patent, the '383 Patent describes the need for "a zirconia sintered body having excellent translucency with a high sintered body density," and providing a zirconia powder for producing a zirconia sintered body by a simple sintering process without pressure. '383 Patent at 2:64–3:2. In solving that problem, the inventors found "it is necessary not only to improve the total light transmittance, but also to control the composition and physical properties of the zirconia powder and further their relationships." *Id.* at 3:17–21.

To that end, Claim 1 recites:

1. A translucent zirconia sintered body containing more than 4.0 mol % and at most 6.5 mol % of yttria and less than 0.1 wt % of alumina, and having a **relative density** of at least 99.82%, a total light transmittance of at least 37% and less than 40% to light with a wavelength of 600 nm at a thickness of 1.0 mm, a crystal grain size of from 0.3 to 1.0 μm, and a bending strength of at least 500 MPa.

'383 Patent at 23:26–32 (disputed term in bold). The issue, again, relates to the claims' use of the phrase "relative density."

### D.    U.S. Patent 11,548,825

The '825 Patent "relates to a composition in which layers of zirconia are layered and to a zirconia layered body." '825 Patent at 1:7–8. The patent explains:

A zirconia ($ZrO_2$) sintered body is produced by molding raw material powder which mainly contains zirconia and sintering the molded raw material powder. The raw material powder thermally shrinks and is densified through heat treatment such as sintering or calcination. The behavior of the raw material powder during heat treatment differs depending on the characteristics of the raw material powder, particularly the composition of the raw material powder.

*Id.* at 1:12–19. The patent stresses that small differences in the content of additives can result in significantly different characteristics of the body, like shrinkage behavior. *See id.* at 1:20–32.

The patent references two attempts to address this problem. In one attempt, "compositions and thermal shrinkage behaviors of raw material powder are adjusted by coating the raw material powder with a dopant, and the raw material powder are molded to obtain a sintered body consisting of a layered body having different color tones without distortion." '825 Patent at 1:33–38. In the other attempt, "a sintered body, which consists of a layered body having a change in color tone and layers having different contents of colorants, is obtained by layering and molding layers by applying vibration so as to form a boundary layer in which powder of upper and lower layers are mixed with each other." *Id.* at 1:38–44. Both approaches, however, result in "a different texture compared to natural teeth." *Id.* at 1:62–64.

The patent aims to address that texture problem. It teaches a layered body in which each of two or more layers contain zirconia with a stabilizer. The layered body includes a first layer containing zirconia with a stabilizer content of higher than or equal to 4 mol %, and a second layer containing zirconia with a stabilizer content different from that of the first layer. '825 Patent at [57]. Claim 1 recites:

> 1. A layered body having a structure in which two or more layers containing zirconia containing a stabilizer are layered, the layered body comprising at least:
>
> a first layer containing zirconia having a stabilizer content of

> higher than or equal to 4 mol %; and a second layer containing zirconia having a stabilizer content different from that of the zirconia contained in the first layer, wherein a difference between the stabilizer content in the first layer and the stabilizer content in the second layer is greater than or equal to 0.5 mol %, and the layered body is a **calcined body**.

*Id.* at 34:24–34 (disputed term in bold). The parties dispute the scope of "calcined body," although they reached some agreement at the hearing.

## II.     LEGAL STANDARDS

### A.     General Principles

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations

omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

### B.    Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572

U.S. 898, 901 (2014). The claims "must be precise enough to afford clear notice of what is claimed" while recognizing that "some modicum of uncertainty" is inherent due to the limitations of language. *Id.* at 909. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

Here, Direkt's "indefiniteness" challenges relate to whether multiple methods for determining "relative density" and "lightness" "lead to different results without guidance as to which method should be used," *Akamai Techs., Inc. v. MediaPointe, Inc.*, No. 2024-1571, 2025 WL 3274871, at *7 (Fed. Cir. Nov. 25, 2025).

> [A] claim may be invalid as indefinite when (1) different known methods exist for calculating a claimed parameter, (2) nothing in the record suggests using one method in particular, and (3) application of the different methods result in materially different outcomes for the claim's scope such that a product or method may infringe the claim under one method but not infringe when employing another method.

*Ball Metal*, 838 Fed. App'x at 542.

## III.    THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, Tosoh says a skilled artisan at the time of invention "would have had a Bachelor of Science in materials science, ceramics or chemistry, and at least [3–5] years of experience working

with yttria-stabilized zirconia sintered products." Dkt. No. 59 at 3 (quoting Fischman Decl., Dkt. No. 59-5 ¶ 8). Direkt's expert opines a skilled artisan "would have included a person with a Bachelor of Science degree in materials science, engineering, chemistry, physics, or an equivalent degree. Alternatively, a [skilled artisan] would have at least one year designing, developing, testing, or manufacturing sintered zirconia-containing products or manufacturing processes." Dkt. No. 62 at 5 (quoting Griggs Decl., Dkt. No. 59-6 ¶ 15). Each party contests the other's characterization, but "[b]ecause neither party contends that the different proposed levels of skill have any material impact on the present claim construction disputes, the Court need not resolve those differences now." *Id.* at 6.

## IV.    THE DISPUTED TERMS

A.    **"wherein the . . . sintered body . . . has a relative density of at least 99.80%" ('056 Patent, Claim 1, 2–6, 8–9, 11, 13)**

**"sintered body characterized . . . by having a relative density of 99.8% or higher . . . wherein relative density means the value obtained by measuring an actual density ρ by the Archimedes method" ('157 Patent, Claims 1, 3, 5, 7, 9, 11)**

**"having a relative density of at least 99.82%" ('383 Patent, Claim 1, 2, 11, 12)**

| Tosoh's Constructions | Direkt's Construction |
|---|---|
| **'056 Patent, Claim 1:** Given the length of Tosoh's proposed construction, *see* Joint Cl. Constr. Chart, Dkt. No. 68-1 at 1–2. | Indefinite under 35 U.S.C. § 112(b) and/or § 112(a) |
| **'157 Patent, Claim 1:** No construction required as the term is defined within the claim itself. *See* Joint Cl. Constr. Chart, Dkt. No. 68-1 at 2–4 for an alternative construction. | Indefinite under 35 U.S.C. § 112(b) and/or § 112(a) |
| **'383 Patent, Claim 1, 2, 11, 12** *See* Joint Cl. Constr. Chart, Dkt. No. 68-1 at 5–6. | Indefinite under 35 U.S.C. § 112(b) and/or § 112(a) |

These disputes concern the "relative density" of the claimed sintered body, which is the ratio of the measured density to the theoretical density. '056 Patent at 9:63. Notably, the specifications provide slightly different explanations for "theoretical density," which is why Tosoh's proposed constructions differ for the same term in the three patents. *See* '056 Patent at 9:58–10:5; '383 Patent at 4:32–5:8.

The parties dispute whether these claims' use of "relative density," which depends on "measured density," renders the claims indefinite under the test summarized in *Ball Metal*. Under that test,

> a claim may be invalid as indefinite when (1) different known methods exist for calculating a claimed parameter, (2) nothing in the record suggests using one method in particular, and (3) application of the different methods result in materially different outcomes for the claim's scope such that a product or method may infringe the claim under one method but not infringe when employing another method.

*Ball Metal*, 838 Fed. App'x at 542. Direkt says different known methods exist for measuring the density of sintered bodies, but nothing in the record suggests using a particular method. Dkt. No. 62 at 10–16. Moreover, the different methods lead to materially different outcomes, thus making the claim scope dependent on the choice of methodology. *Id.* at 16–20. According to Tosoh, however, there is only one method for measuring the relative density, which the patents teach. Dkt. No. 59 at 11–13. And even if there is more than one method, the different methods would not result in materially different outcomes. *Id.* at 19–20.

### 1.    *Whether different known methods exist for measuring density*

Direkt says a skilled artisan would know of two methods of density measurement set forth in International Standard ISO 18754:2003: (1) the boiling method, and (2) the vacuum method. Dkt. No. 62 at 11. Both methods involve sample preparation and a "liquid impregnation step" as

part of the measurement process. *Id.* According to Tosoh, however, there is only one disclosed method for measuring density—the Archimedes method—despite that there may be multiple ways to prepare the sample. Dkt. No. 59 at 19. In Tosoh's view, Direkt makes an argument about infringement, not indefiniteness. *Id.* (citing *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369 (Fed. Cir. 2017)).

Resolving this part of *Ball Metal*'s test turns on whether "sample preparation" is part of the measurement method, which it is. If sample preparation is required for the measurement—and Tosoh doesn't contest that—that's part of the measurement process. That's supported by the standard to which Direkt points, which presents both the "boiling method" and "vacuum method" as options from which to choose. Given the reference to both preparation techniques in a cited standard, a skilled artisan would understand these as two paths within the broader testing methodology.

Citing *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369 (Fed. Cir. 2017), Tosoh says these are questions of infringement rather than indefiniteness, but that case is distinguishable. *Presidio* concerned an insertion-loss-measurement method in an industry for which "standards for insertion loss testing had not been published at the time the patent was filed." *Presidio*, 875 F.3d at 1376. "Insertion loss measures how much of a signal is lost when a capacitor is inserted into a circuit." *Id.* The claim at issue, which was directed to a capacitor, required "form[ing] a first fringe-effect capacitance . . . that is capable of being determined by measurement in terms of a standard unit." *Id.* at 1378. At trial, Presidio's expert testified that, despite no industry standard, a skilled artisan "would know how to measure fringe-effect capacitance by using insertion loss measurements to measure overall capacitance." *Id.* at 1376. The skilled artisan could then make physical modification to remove parts of the capacitor and make another measurement, which "would necessarily be attributable to the fringe-effect capacitance," and "would then be able

to determine the capacitance in terms of standard unit of Farads." *Id.* In other words, Presidio was showing the fringe-effect capacitance was "capable of being determined by measurement in terms of a standard unit," as required by the claims. The questions were not (1) whether a certain fringe-effect capacitance was required, and (2), if so, were there were multiple ways to measure that fringe-effect capacitance. *See id.* at 1377 (noting *Presidio* does not describe a situation "in which the challenger has shown that there were competing existing methodologies that reached different results, and the patent failed to describe which of the multiple methods to use").

Here, Tosoh suggests the Court should ignore two distinct ways of determining the relative density of the accused devices because, in the end, both methodologies end with the same step of submerging the test sample in water. But these are different known methods for calculating the relative density.

> 2.      *Whether the record informs one of ordinary skill in the art to use a particular methodology*

Tosoh says that, even if there are different known methods, a skilled artisan would know not to use the boiling method because zirconia is susceptible to leaching its stabilizing elements (e.g., yttria) when immersed in water. Dkt. No. 59 at 19. Logically, says Tosoh, a skilled artisan "would understand that if a sample is susceptible to degradation when immersed in aqueous media (*i.e.*, water), they would understand that sample should ***not*** be measured using the boiling method." *Id.*

Direkt makes three arguments in response. First, nothing in the intrinsic record discusses when or when not to use the boiling method for sample preparation. Dkt. No. 62 at 14. Second, both methods have problems, so it's not obvious which method is better. *Id.* at 15. Third, Tosoh's infringement contentions, which assert the accused instrumentalities "were boiled for one hour in

water followed by cooling," contradict its argument that the boiling method should not be used. *Id*.

The Court again agrees with Direkt. Critically, Tosoh points to nothing in the intrinsic record of the patent that teaches which of the methods to use. Instead, Tosoh points to *extrinsic* evidence, but the relevant authority says nothing about considering *extrinsic* evidence when making this determination. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015) ("look[ing] to the patent record—the claims, specification, and prosecution history—to ascertain if they convey to one of skill in the art with reasonable certainty the scope of the invention claimed" where there were three different ways of measuring weight). The Court concludes the *patent* record does not inform one of ordinary skill in the art to use a particular methodology, and Direkt therefore has carried its burden on this part of the *Ball Metal* test.

> 3.    *Whether the application of the different methods leads to materially different outcomes for the claims' scope*

Direkt says the "boiling method" and "vacuum method" lead to different results. Dkt. No. 62 at 16–20. According to its expert, "a given zirconia sintered body with a calculated 'relative density' of 99.8%—based on a measured density obtained via the vacuum method—would separately be determined to have a 'relative density' of only between 99.2% and 99.6%" using the boiling method. *Id.* at 16–17 (citing Griggs Decl., Dkt. No. 62-1 ¶ 49; cleaned up). Tosoh criticizes Direkt's expert's calculations as hypothetical. Applying what it calls "the correct number of significant figures as specified in the '157 Patent," the relative density before or after the hypothetical boil are the same. Dkt. No. 65 at 5.

Direkt has not carried its burden with respect to this part of the test. Direkt's expert relies on International Standards ISO 6872:2008 and ISO 6872:2024, saying Annex C to the latter

"presents the protocol for measuring hydrothermal stability (resistance to hydrolytic degradation) of dental zirconia products. This supports a POSITA's recognition that zirconia is susceptible to the leaching of its stabilizing elements (such as yttrium) when it is immersed in aqueous media." Griggs Decl., Dkt. No. 62-1 ¶ 37. But Annex C appears unrelated to short-term yttrium leaching. *Id.* at 151. Rather, "the main objective of [Annex C] is to assess the aging sensitivity of a dental zirconia presenting a given, representative, surface preparation and its potential effect on mechanical properties." *Id.* Some samples are aged in an autoclave to simulate "a few years in vivo" and then all samples are subjected to mechanical testing. *Id.* The aged samples are then compared to as-received samples under x-ray diffraction and scanning electronic microscopy. *Id.* Direkt, however, has not shown why these test results would be analogous or useful for the much shorter times specified in ISO 18754. That assumes the same mass lost rate during the first three hours as over "a few years in vivo," and the Court is not prepared to make that leap without more.

Dr. Griggs also relies on ISO 6872's maximum limit of 2 mg/cm$^2$ for the allowable amount of solubility. "If the sample leaches the maximum allowed mass of 2 mg/cm$^2$," he writes, "then there would be an error of 0.6%. In other words, if a particular sample had an actual relative density of 99.8%, then it would instead be measured as 99.2%." Griggs Decl., Dkt. No. 62-1 ¶ 49. But the table to which Dr. Griggs points, Table 1 (below), is about maximum allowable value of solubility acceptable for a structural test set forth in the testing procedure. *Id.* at 95 ("The physical and chemical properties of ceramic test specimens tested in accordance with the relevant methods, detailed for Type I and Type II ceramics in Clause 7, shall comply with the requirements specified in Table 1."). In other words, this standard seems to say, "Don't do this structural test on Class 5 samples unless the solubility is less than 2 mg/cm$^2$." It *doesn't* say what the chemical solubility *is*, and the purpose of ISO 6872 is so different from the purpose of ISO 18754 that the Court struggles to see

why it helps resolve the underlying question, at least in a "clear and convincing" way.

**Table 1 — Classification of ceramics for fixed prostheses by intended clinical use**

| Class | Recommended clinical indications | Mechanical and chemical properties | |
|---|---|---|---|
| | | Flexural strength minimum (mean) | Chemical solubility maximum |
| | | MPa | $\mu g \cdot cm^{-2}$ |
| 5 | Substructure ceramic for three-unit prostheses involving molar restoration. | 500 | 2 000 |
| 6 | Substructure ceramic for prostheses involving four or more units. | 800 | 100 |

**Table 1 of ISO 6872**

Ultimately, after reviewing and considering multiple highly technical specifications, Dr. Griggs's lengthy declaration, and Direkt's arguments at the hearing, the Court hasn't reached the point where it believes it "highly probable" that application of the different testing methodologies would lead to materially different results. *See Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (explaining "clear and convincing evidence" requires "an abiding conviction that the truth of the factual contention is 'highly probable'" (quoting *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993))). Thus, because Direkt has not carried its burden under the third prong of *Ball Metal*, the Court holds "relative density" is not indefinite and will give this term a "plain and ordinary meaning" construction for each of the patents. [1]

---

[1] Although Tosoh proposes specific constructions for two of the independent claims using the meaning of "theoretical density" from the respective specifications, there doesn't appear to be dispute that Tosoh does so correctly based on each specification. Instead, Direkt only says that even if Tosoh's constructions are used, it doesn't resolve the indefiniteness problem. *See* Dkt. No. 62 at 7. Because the meaning of "theoretical density" is not at issue, a "plain and ordinary meaning" construction will suffice.

**B.**     **"wherein the . . . sintered body has a lightness L\* of from 51 to 80 in L\*a\*b\*color system" ('056 Patent, Claims 1, 2–6, 8–9, 11, 13)**

| Tosoh's Construction | Direkt's Construction |
|---|---|
| No construction required as the term is defined within the claim itself. Alternatively, "the lightness measured as L\* in the L\*a\*b\* color system." | Indefinite under 35 U.S.C. § 112(b) and/or § 112(a) |

As with the relative-density terms, Direkt challenges this phrase as indefinite because application of different methods allegedly results in materially different outcomes. The specifics relate to whether a "gloss trap" is used during the measurement of "lightness," or L\*. Dkt. No. 62 at 25. A gloss trap is an optical device used in colorimeters and spectrophotometers that eliminates shiny light reflections when measuring a sample's color. When used, a gloss trap captures the light reflecting off an angle of a surface at an angle equal to the angle of incidence, which "is the gloss or the specular component of the reflection." Griggs Depo. Tr., Dkt. No. 59-7 at 79:10–24. Direkt says the use or non-use of a gloss trap when measuring L\* leads to materially different results, and points to different measured L\* values from Tosoh's infringement contentions based on different instruments. N 62 at 23.

Tosoh characterizes Direkt's "gloss trap" argument as a red herring. Dkt. No. 65 at 7. According to Tosoh, the measurement method is defined in the disputed term itself, and the specification provides a clear teaching of the appropriate method by referencing Japan Industrial Standard (JIS) Z8729. Dkt. No. 59 at 9 (citing '056 Patent at 10:25–30). That standard, in turn, incorporates JIS Z8722, which provides a detailed description of how to measure L\*, a\*, and b\*. *Id.* Moreover, the specification "teaches away" from using a gloss trap because it teaches "collecting all of the reflected light." *Id.* at 12–13 (citing '056 Patent at 5:28–38); *see also* Dkt. No. 65 at 8.

To start, the Court disagrees with Tosoh that the patent teaches away from using a gloss

trap. JIS Z 8722, which is part of JIS Z 8729, discloses the option of using a gloss trap as part of the measurement for certain "geometry conditions." JIS Z 8729, Dkt. No. 59-8 at 1 (incorporating the JIS Z 8722 standard); JIS Z 8722, Dkt. No. 59-9 at 16 (Table 2). Also, the part of the specification on which Tosoh relies for the "teaching away" refers to "collecting light transmitted through the sintered body and light reflected from the surface of the sintered body," '056 Patent at 5:32–36, not (as Tosoh puts it) "collect[ing] **all** reflected light." Although Tosoh appears to read that language as establishing a gloss trap isn't used, it seems ambiguous on that point.

That said, Direkt does not clearly and convincingly establish that measurements of lightness with and without a gloss trap under JIS Z8729 are materially different. For one, the Court finds nothing in JIS Z8729 or JIS Z 8722 that suggests they are, and Direkt doesn't point to anything from those standards suggesting different results. Nor does Direkt provide any actual experimental results showing the use or non-use of a gloss trap according to those standards would have different results.

Instead, Direkt's expert broadly opines the use of a gloss trap in the measurements reported in the patent *may* fall below or above the claimed range, Griggs Decl., Dkt. No. 62-1 ¶ 60, "produces a significantly different result than choosing to conduct the measurement without a gloss trap," *id.* ¶ 59, and "the inclusion or omission of a gloss trap would be directly relevant to whether or not [a] measured sample falls inside or outside the lightness range set forth in claim 1," *id.* ¶ 60. Nowhere, however, does Direkt or its expert explain *how* those results would vary or how the use of a gloss trap would affect the results—only that they are "significantly different," which is too ambiguous. Actual experimental results would be helpful, or at least an explanation of how a gloss trap predictably and specifically affects the measurement.

For example, Direkt's expert says "[a] POSITA understands that if [the L* value of 55.7

18 / 22

reported as Ex. 2 in Table 1] was taken with a gloss trap in place . . . the L* value *may* fall below 51 and thus not meet the 51 to 80 lightness range recited in claim 1." Griggs Decl., Dkt. No. 62-1 ¶ 60 (emphasis added). But why isn't the "may" a "would"? Dr. Griggs's opinion would be stronger if that sentence read, "If the L* value of 55.7 reported as Ex. 2 in Table 1 was taken with a gloss trap in place . . . the L* value *would* fall below 51 because of [as only an example] measurements with a gloss trap are consistently 10% less than measurements without a gloss trap because [physics-based explanation], which means the L* measurement with a gloss trap would be 50.13,[2] and thus outside the recited 51-to-80 lightness range." Regardless of what the specific language or analysis would be, in the absence of experimental results, that level of specificity and unequivocality would strengthen Direkt's position, but the Court can't find it in the record.

As for Direkt's argument about different L* values in Tosoh's infringement contentions, without knowing how those measurements were taken, they are of little value. If Direkt had established, despite the different instruments, the devices were functionally the same but for the presence or absence of a gloss trap, that would have been more persuasive. But the disparity in the "lightness" values is more of an indictment of Tosoh's contentions than the definiteness of the disputed phrase.

"Clear and convincing evidence" requires "an abiding conviction that the truth of the factual contention is 'highly probable.'" *Am-Pro Protective Agency, Inc.*, 281 F.3d at 1240 (quoting *Price v. Symsek*, 988 F.2d at 1191). Here, the "factual contention" is that the use and non-use of a gloss trap results in materially different outcomes. The Court, however, is not left with an "abiding conviction" that such use or non-use "result[s] in materially different outcomes for the claim's

---

[2] $55.7 - (10\% \times 55.7) = 55.7 - 5.57 = 50.13$.

scope such that a product or method may infringe the claim under one method but not infringe when employing another method." Accordingly, the Court holds Direkt has not carried its burden of showing the phrase is indefinite and construes this term as "wherein the . . . sintered body has a lightness L* of from 51 to 80 in L*a*b*color system when measured according to the methodology set forth in JIS Z8729."

### C.    "calcined body" ('825 Patent, Claims 1, 2, 4–9, 17–18)

| Tosoh's Construction | Direkt's Construction |
|---|---|
| "a partially sintered precursor of a sintered body, and is also called a pre-sintered body, soft-sintered body or a semi-sintered body" | "a body of zirconia particles processed at a temperature that is lower than a sintering temperature" |

At a high level, this dispute relates to the differences between a green body, a calcined body, and a sintered body. The parties agree that each of these is mutually exclusive of the others, but each party asserts the other party's proposed construction improperly encompasses one of the other categories. For example, Tosoh says "there are two distinct 'precursor' bodies to the sintered body—a green body and a calcined body," but that Direkt's construction encompasses a "green body" and a "calcined body." Dkt. No. 59 at 28. Direkt responds that Tosoh's construction "threatens to impermissibly expand the scope of its claims to cover particular non-calcined body types that were expressly excluded from the scope of the claims. Dkt. No. 62 at 27; *see also id.* at 30 (asserting that, under Tosoh's construction, "a green body heat treated at a temperature between 1,200 °C and 1,600 °C, for example, could qualify simultaneously as both a 'calcined' and 'sintered' body").

As the hearing made clear, there's not much dispute here. The parties agree "green body," "sintered body," and "calcined body" are mutually exclusive. *See* Hr'g Tr., Dkt. No. 80 at 62:17–18 (Tosoh explaining "[w]e need to discern between the three bodies"); *id.* at 64:5–12 (Direkt

noting the specification describes the different bodies as distinct). The only issue Tosoh has with Direkt's construction is that it would potentially include green bodies. *Id.* at 62:8–15. But despite its facially broad construction, Direkt's construction was not intended to encompass a "green body" within it. *Id.* at 63:7–12 (indicating it would have "[n]o problem at all" if the Court adopts a construction that excludes a green body). Based on the parties' input at the hearing, the Court construes "calcined body" as "a body of zirconia particles heat treated at a temperature above that of a green body and below that of a sintered body."

## V.    CONCLUSION

| Disputed Term | The Court's Construction |
|---|---|
| "wherein the . . . sintered body . . . has a relative density of at least 99.80%"<br><br>('056 Patent, Claims 1, 2–6, 8–9, 11, 13) | Plain and ordinary meaning |
| "sintered body characterized . . . by having a relative density of 99.8% or higher . . . wherein relative density means the value obtained by measuring an actual density $\rho$ by the Archimedes method"<br><br>('157 Patent, Claims 1, 3, 5, 7, 9, 11) | Plain and ordinary meaning |
| "having a relative density of at least 99.82%"<br><br>('383 Patent, Claims 1, 2, 11, 12) | Plain and ordinary meaning |
| "wherein the . . . sintered body has a lightness L* of from 51 to 80 in L*a*b*color system"<br><br>('056 Patent, Claim 1, 2–6, 8–9, 11, 13)) | "wherein the . . . sintered body has a lightness L* of from 51 to 80 in L*a*b*color system when measured according to the methodology set forth in JIS Z8729" |
| "calcined body"<br><br>('825 Patent, Claims 1, 2, 4–9, 17–18) | "a body of zirconia particles heat treated at a temperature above that of a green body and below that of a sintered body" |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim-construction proceedings is limited to informing the jury of the positions adopted by the Court.

**So ORDERED and SIGNED this 19th day of May, 2026.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE